```
 1                   UNITED STATES DISTRICT COURT
 2                  CENTRAL DISTRICT OF CALIFORNIA
 3          HONORABLE PHILIP S. GUTIERREZ, JUDGE PRESIDING
 4   SUMMIT ENTERTAINMENT, LLC,    )
                                   )
 5                                 )
                                   )
 6                  Plaintiff,     )
                                   )
 7                                 )
                                   )
 8         Vs.                     )   No. CV 09-1864-PSG
                                   )
 9                                 )
                                   )
10   BECKETT MEDIA, ET AL.,        )
                                   )
11                                 )
                                   )
12                  Defendants.    )
                                   )
13   _____)
14
15
16             REPORTER'S TRANSCRIPT OF PROCEEDINGS
17                    LOS ANGELES, CALIFORNIA
18                   MONDAY, JANUARY 11, 2010
19   _____
20
21              MIRIAM V. BAIRD, CSR 11893
           OFFICIAL U.S. DISTRICT COURT REPORTER
22            255 EAST TEMPLE STREET, # 181-K
              LOS ANGELES, CALIFORNIA 90012
23                    (213) 894-2853
                    MVB11893@aol.com
24
25
```

| | |
|---|---|
| 1 | **A P P E A R A N C E S** |
| 2 | |
| 3 | **IN BEHALF OF THE PLAINTIFF, SUMMIT:**    MANATT, PHELPS, & PHILLIPS, LLP |
| 4 | BY: JILL M. PIETRINI |
| | 11355 WEST OLYMPIC BOULEVARD |
| 5 | LOS ANGELES, CALIFORNIA 90064 |
| 6 | |
| 10 | |
| 11 | **IN BEHALF OF THE DEFENDANT, BECKETT:**    JOEL MCCABE SMITH |
| | 2049 CENTURY PARK EAST SUITE 3110 |
| 12 | LOS ANGELES, CALIFORNIA 90067 |

```
 1        LOS ANGELES, CALIFORNIA; MONDAY, JANUARY 11, 2010; 3:30 P.M.
 2                              ---
 3
 4              THE CLERK:  Calling CV 09-1864-PSG.  Summit
 5    Entertainment, LLC vs. Beckett Media, et al.
 6              Counsel, please state your appearance for the
 7    record.
 8              MS. PIETRINI:  Good afternoon, Your Honor.
 9              Jill Pietrini for plaintiff, Summit Entertainment.
10              THE COURT:  Good afternoon.
11              MR. SMITH:  Joel Smith for defendant Beckett.
12              THE COURT:  Good afternoon.
13              Ms. Pietrini, if you would approach the lectern.  I
14    have a few questions.  Do you have your proposed temporary
15    restraining order?
16              MS. PIETRINI:  Yes, I do, Your Honor.
17              THE COURT:  In the event the Court were to grant
18    your request for a preliminary injunction, I'm going to ask
19    that you submit a new order that would reflect our discussion
20    and the fact that it's permanent as opposed to temporary.
21              The first question I have.  This relates to some
22    items in the opposition, Paragraph 1-A, and my concern is if
23    you look at that paragraph, whether or not it also prohibits
24    fair use, and whether the problem could be solved by simply
25    saying it's not intended to prohibit fair use?
```

1     MS. PIETRINI:  I understand your point, Your Honor.
2  I think it sort of begs the question because everything --
3  they're going to argue everything is fair use.  I know it's
4  going to have an injunction on that.  I'm certainly open for
5  language to that effect, but the defendant really hasn't
6  shown us how it might be fair use.
7     THE COURT:  I think that's a good point.  But if
8  the language is so broad at the outset that it also would
9  encompass potentially fair use.  I'm concerned about that as
10 well.  So, for example, if one of the magazines included a
11 review --
12    MS. PIETRINI:  Right.
13    THE COURT:  -- of the movies or some kind of
14 feature about the movies.
15    I'm concerned that Paragraph A may prohibit that
16 possibility.
17    MS. PIETRINI:  Maybe give examples, like what you
18 just said like review.  We've given examples of the *Hollywood*
19 *Reporter* and the *Daily Variety* as the types of things we
20 would consider fair use.
21    THE COURT:  And then if you look at Paragraph C --
22    MS. PIETRINI:  Okay.
23    THE COURT:  -- and D, are they too broad in the
24 sense they go beyond the discussion in the papers in terms of
25 just talking about the marks, *Twilight* and *Twilight New Moon?*

 1        MS. PIETRINI:  Well, we have alleged unfair
 2   competition claim, 43(a) claim, which is broader than a
 3   straight trademark infringement claim.  That's what those --
 4   Paragraphs C and D are directed to that, but we certainly can
 5   work on narrowing it if that is something that you're not
 6   comfortable with.  Like maybe stopping at falsely implying
 7   Summit's endorsement or license of defendant's goods, and
 8   work on the language of the back end of Paragraph D.
 9        THE COURT:  All right.  Thank you.
10        Mr. Smith?
11        MR. SMITH:  Yes, Your Honor.
12        THE COURT:  I'd like you to address in the
13   opposition there's a representation made that the topic
14   raised in the motion had basically stopped occurring.  Then
15   in the reply there's indications in the declarations that
16   magazines are still being sold at Barnes and Nobles and
17   Walgreens and things like that.
18        MR. SMITH:  Your Honor, that's a function of the
19   way that industry works.  What the publisher does is has a
20   deal in this case with a company called Curtis Circulation.
21   Curtis circulation is the one that has the local deals that
22   get the product delivered to the retail outlets.
23        All that the publisher Beckett can do is tell
24   Curtis, go to your people and tell them to go pull these out
25   of stores.  That's what happened.  That's what was to have

1  happened. There isn't much else, even if a Court were
2  inclined to do it, that it could order Beckett to do other
3  than get people in cars, driving to drug stores, looking for
4  the magazine.
5       I'm told that Curtis is a big company. They do
6  this kind of thing routinely. They're very effective at it,
7  although sometimes some things get missed because they're
8  either not in the proper cubby hole in the retail outlet
9  where you would go pull it. It's somewhere else on the day
10 it goes to get pulled, and maybe later it gets moved to the
11 proper cubby hole. It's not fool-proof, but it's the only
12 system the publisher has available to it to recall is to tell
13 Curtis.
14      In the supplemental declaration of Nick Singh, I
15 provided that notice, tell Curtis go out to all your
16 wholesalers, tell them all to go get the magazine and destroy
17 them. Everybody hopes that gets accommodated.
18      THE COURT: But because of what happened after the
19 opposition was filed, doesn't that -- to use a kinder word,
20 but eviscerate the mootness point. It's still not moot
21 because all we have is a hope.
22      MR. SMITH: The reason it does moot the point is
23 because the Court, if it were inclined to issue a preliminary
24 injunction, would issue it against the defendant Beckett.
25      Would it prohibit defendant Beckett from further

```
 1    publishing the magazines?  That's within Beckett's control.
 2    Would it mandatorily order Beckett to go out to all the
 3    retailers and see if there are any more magazines to be
 4    pulled?  I would question the constitutionality of that.
 5             THE COURT:  Why?
 6             MR. SMITH:  I think it would be unreasonable.
 7    These magazines -- I mean, there could be, I would assume,
 8    tens of thousands of retailers throughout the United States
 9    that typically would get Beckett magazines.  They're a major
10    publisher.  To put the onus on Beckett to somehow go out to
11    each drug store, Walgreens, Wal-Mart, and check again after
12    Curtis did would be an undue burden, an unnecessary burden.
13             THE COURT:  Anything else to add?
14             MR. SMITH:  Well, I'm not sure how to approach it,
15    but at the time this lawsuit began, Beckett seemed to be the
16    first publisher to have done -- this relates to the fair use
17    argument, the importance of the fair use argument.  Beckett
18    appears to have been the first major publisher to have
19    focused on these films.
20             While we've been doing the briefing, these
21    magazines, all from different publishers, all around the
22    world, are showing up in the stores.  I checked Pacer
23    expecting to find that Summit had sued these publishers, and
24    was surprised to learn that the only publisher that has been
25    sued is Beckett for a magazine that Beckett tried to recall
```

```
 1    six days after the lawsuit.
 2              To the extent that fair use is a critical defense
 3    now, particularly in light of what is happening in the
 4    marketplace relating to these movies, I think that the focus
 5    properly needs to be on -- if there is going to be any kind
 6    of injunctive relief, that it accurately and completely
 7    protects the fair use by Beckett of this information in
 8    subsequent publications.
 9              THE COURT:  I think I expressed that concern as
10    well as it related to the first paragraph; that somehow if
11    there is injunctive relief granted, that it encompassed the
12    possibility of fair use.
13              MR. SMITH:  Well, then here's where I go with that.
14    I'm not sure what the procedural way to do this would be, but
15    based upon what I now know, I certainly have been rethinking
16    whether or not earlier in this case we should have asserted
17    the defense of fair use and litigated that as this evidence
18    as it has developed would further support an argument that
19    what Beckett did was a fair use, and with the Court focusing
20    only on the Beckett magazines, I don't want the Court to
21    assume that's all that is in the marketplace.
22              It's possible that there will be a third magazine
23    that will talk about *New Moon* or *Twilight* from Beckett under
24    the doctrine of fair use.  Clearly, a fair use magazine.  If
25    the Court is going to compel some kind of additional recall
```

```
 1   by Beckett, I have to revisit the propriety of the whole fair
 2   use defense to the Beckett magazines.  Which rather than
 3   address that and fight on that playing field at the time, a
 4   decision was made to recall them.
 5           THE COURT:  I think then at that point, wouldn't
 6   the proper mechanism be a motion for reconsideration?
 7           MR. SMITH:  Yes.
 8           THE COURT:  You would explain to me what the new
 9   facts were, why they weren't --
10           MR. SMITH:  I think so.
11           THE COURT:  -- available prior to this hearing
12   date?
13           MR. SMITH:  I think yes.  Think is coming fairly
14   fast, this information and this development, but yes.
15           As far as my processing had gotten, that would be
16   the appropriate way to do it.
17           THE COURT:  Anything else?
18           MR. SMITH:  I think that's it, Your Honor.
19           THE COURT:  Ms. Pietrini?
20           MS. PIETRINI:  Yes.  I'd like to respond to a
21   couple issues, Your Honor.
22           First of all, in terms of the mootness -- and I
23   figured that would come up -- things are recalled all of the
24   time in the marketplace.  It's not like it's this
25   unbelievable thing that no one ever does.  You send out a
```

1  notice, you give them a tracking number, they send it back,
2  they quarantine the inventory, and then hold it.
3           The evidence of the recall here is just a notice
4  with no date, no distribution list.  Beckett certainly could
5  have gotten a declaration.
6           THE COURT:  Right.  You mentioned that in your
7  reply.
8           MS. PIETRINI:  Exactly.  So they didn't do any of
9  that.
10          More importantly, Beckett itself is still selling
11 and promoting this magazine.  My paralegal received a copy on
12 the one she purchased on December 3, 2009.  I have a
13 supplemental declaration from her that is showing it still on
14 Beckett's Website.  When you click on it, then it says, out
15 of stock, but it's featured on the website, the first issue.
16          So they haven't really stopped.  There was
17 somebody's declaration -- I think it was Mr. Singh said that
18 it's not in -- you can't see it on the website; you can't
19 review it.  From what we found, it is not necessarily true.
20 So Beckett certainly could have stopped its own conduct and
21 has not done so.
22          In terms of the fair use.  One, he pled it.  He had
23 the opportunity to argue it.  You gave him a lot of time to
24 prepare the opposition.  It wasn't there.
25          THE COURT:  Right.

1    MS. PIETRINI: In terms of me arguing on the fair
2    use, I know a lot of stuff off the top of my head.
3    THE COURT: I think the proper mechanism is if
4    there is this new evidence, then present it to the Court and
5    explain to the Court why it wasn't presented today or prior
6    to today, you know, what was the due diligence and everything
7    else.  Once we know and I see what we're talking about, but
8    it seemed to me it would be appropriately left for a motion
9    for reconsideration.  You would get notice as to what the
10   magazines were, what the fair use argument was, and the
11   argument as to why it wasn't presented earlier, is it really
12   new, and then we'd see each other on a motion for
13   reconsideration.
14   MS. PIETRINI: I understand.  I think this is
15   so far beyond trademark context, it is so far beyond fair use
16   that it's pretty straightforward.  Under Ninth Circuit law,
17   you can only use something as much as you need to in order to
18   describe it.  This is the name of the magazine in the
19   stylized font.
20   THE COURT: Right.
21   MS. PIETRINI: So you got a problem right there.
22   In the terms of copyright, you have the problem of
23   taking pretty much everything, cropping it, changing it.
24   Here you have a pull-out poster and printing plates, selling
25   it.  We're well beyond a fair use.  I understand if Mr. Smith

1  is going to file a motion for reconsideration should you
2  enter the injunction, we will have an opportunity to further
3  go into that.
4         With respect to third-party magazines, there's
5  substantial amount of law that says you do not need to go out
6  after every infringer at the same time.  The fact that his
7  client was first out of the gate, we pursued that.  And we
8  pursue the others as we deem appropriate on that front.
9         THE COURT:  The Court will issue an order granting
10 the preliminary injunction.  I'll issue that by tomorrow.  It
11 will instruct you to prepare a revised permanent injunction
12 order addressing some of the concerns.  I'll be more specific
13 as I can be in the order, and then submit the injunction.
14         And, Mr. Smith, if you would submit any objections
15 to that order within 24 hours so that I can see it.  Either
16 sign it, have another hearing on the objections, or go ahead
17 and execute an order.
18         MS. PIETRINI:  Thank you, Your Honor.
19         MR. SMITH:  Thank you, Your Honor.
20         (Whereupon proceedings were concluded at 4:10 p.m.)
21                        CERTIFICATE
22 I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT
23 TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN
24 THE ABOVE MATTER.
25 FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

1 REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

2 REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

4 _____          01/20/2010

5 MIRIAM V. BAIRD                           DATE
  OFFICIAL REPORTER