1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MANATT, PHELPS & PHILLIPS, LLP
Jill M. Pietrini (Bar No. CA 138335)
    jpietrini@manatt.com
Barry E. Mallen (Bar No. CA 120005)
    bmallen@manatt.com
Diana Iorlano (Bar No. CA 193359)
    diorlano@manatt.com
11355 West Olympic Boulevard
Los Angeles, CA 90064-1614
Telephone: (310) 312-4000
Facsimile: (310) 312-4224

*Attorneys for Plaintiff*
SUMMIT ENTERTAINMENT, LLC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| SUMMIT ENTERTAINMENT, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>BECKETT MEDIA, LLC., a Delaware Corporation, CURTIS CIRCULATION COMPANY, LLC, a Delaware limited liability company, UBIQUITY DISTRIBUTORS, INC., a New York Corporation, and Does 1-10, inclusive,<br><br>Defendants. | Case No. CV09-8161 PSG (MANx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY ADJUDICATION ON LIABILITY**<br><br>Date:        February 7, 2011<br>Time:        1:30 p.m.<br>Ctrm:        Roybal 880<br>Judge:      Hon. Philip S. Gutierrez<br><br>Complaint Filed:      November 6, 2009<br>Discovery Cut-Off:  December 15, 2010<br>Pre-Trial Conf.:        February 28, 2011<br>Trial Date:              March 15, 2011 |

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

300188224.4

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION..................................................................................1

II.     UNDISPUTED FACTS ........................................................................2

    A.   Plaintiff Summit Entertainment ................................................2

        1.   Summit and the Twilight Motion Pictures .................................2

        2.   Summit's Intellectual Property Rights ......................................3

        3.   Summit's Publicity Website ......................................................4

    B.   Beckett, Curtis, and Ubiquity...................................................5

    C.   Defendants' Infringing Products................................................6

        1.   The First Twilight Magazine .....................................................6

        2.   The Second Twilight Fanzine.....................................................7

        3.   The Twilight Printing Plates......................................................7

        4.   Beckett's Access to the Summit Publicity Website ..................8

    D.   History of this Dispute ..............................................................8

III.    LIABILITY IS ESTABLISHED ON SUMMARY ADJUDICATION .........9

    A.   Beckett Infringed the Twilight Marks and Unfairly Competed .........10

        1.   Summit Owns the Twilight Marks ...........................................10

        2.   Defendants Never Had Consent to Use the Twilight Marks ...........11

        3.   There is a Likelihood of Confusion Between the Twilight Marks and Defendants' Use of Them.................................11

    B.   Defendants Are Likely to Dilute the Twilight Marks.......................15

        1.   The Twilight Marks Are Famous and Distinctive...................16

        2.   Defendants Made a Commercial Use Of the Twilight Marks .................18

        3.   The Twilight Marks Were Famous in 2009 .............................18

        4.   Defendants' Use is Likely to Dilute The Distinctive Quality of the Twilight Marks...................................18

    C.   Defendants Have Infringed Summit's Copyrights ...........................19

        1.   Summit Owns the Copyrighted Works.....................................19

        2.   Defendants Infringed the Exclusive Right to Reproduce.........19

        3.   Defendants Infringed the Exclusive Right to Create Derivative Works.................................19

        4.   Defendants Infringed the Exclusive Right to Distribute ..........20

        5.   Beckett Exceeded the Scope of Rights in the Terms of Use ...................21

    D.   Beckett Breached Its Contract With Summit....................................22

Manatt, Phelps & Phillips, LLP
Attorneys At Law
Los Angeles

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

(continued)

**Page**

IV.   CURTIS AND UBIQUITY ARE LIABLE DIRECTLY AND AS JOINT TORTFEASORS ................................................................. 24

V.   CONCLUSION .............................................................................. 25

1

# TABLE OF AUTHORITIES

2

**Page**

3

## CASES

4  *A. Kemp Fisheries, Inc. v. Castle & Cooke, Inc., Bumble Bee Seafoods Div.,*
5     852 F.2d 493 (9th Cir. 1988) ............................................................... 21

6  *Academy of Motion Picture Arts and Sciences v. Creative House*
   *Productions, Inc.,*
7     944 F.2d 1446 (9th Cir. 1991) ............................................................. 12

8  *Am. Online, Inc. v. LCGM, Inc.,*
9     46 F. Supp. 2d 444 (E.D. Va. 1998) ................................................... 24

*American Honda Motor Co. v. Protoform,*
10     325 F. Supp. 2d 1081 (C.D. Cal. 2004) ............................................. 18

11  *AMF Inc. v. Sleekcraft Boats,*
12     599 F.2d 341 (9th Cir. 1979) ............................................ 11, 12, 13, 14

13  *Cable/Home Communication Corp. v. Network Productions, Inc.,*
   902 F.2d 829 (11th Cir. 1990) ............................................................ 20

14  *Celotex Corp. v. Catrett,*
15     477 U.S. 317 (1986) ........................................................................... 10

16  *Century 21 Real Estate Corporation v. Sandlin,*
17     846 F.2d 1175 (9th Cir. 1988) ...................................................... 10, 12

18  *Costello Pub. Co. v. Rotelle,*
   670 F.2d 1035 (D.D.C. 1981) ............................................... 20, 24, 25

19  *Digital Theater Sys. v. Mintek Digital, Inc.,*
20     2004 U.S. Dist. LEXIS 16832 (C.D. Cal. May 25, 2004) .................. 24

21  *Dr. Seuss Enterprises, L.P. v. Penguin, USA, Inc.,*
   109 F.3d 1394 (9th Cir. 1997) ............................................................ 19

22  *Eclipse, Ltd. v. Data General Corporation,*
23     894 F.2d 1114 (9th Cir. 1991) ...................................................... 11, 13

24  *Educational Testing Serv. v. Simon,*
   95 F. Supp. 2d 1081 (C.D. Cal. 1999) ............................................... 20

25  *El Greco Leather Products Co. v. Shoe World, Inc.,*
26     806 F.2d 392 (2d Cir. 1986) ............................................................... 24

27  *Elbe v. Adkins,*
28     812 F. Supp. 107 (S.D. Ohio 1991) ................................................... 19

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

300188224.4

iii

1

2

# TABLE OF AUTHORITIES
## (continued)

Page

3

4

*Entrepreneur Media, Inc. v. Smith*,
    279 F.3d 1135 (9th Cir. 2002) .............................................................. 12, 13, 14

5

*Ets-Hokin v. Skyy Spirits, Inc.*,
    225 F.3d 1068 (9th Cir. 2000) .................................................................. 19

6

7

*Glow Indus. v. Lopez*,
    252 F. Supp. 2d 962 (C.D. Cal. 2002) ..................................................... 11

8

*GoTo.com, Inc. v. Walt Disney Co.*,
    202 F.3d 1199 (9th Cir. 2000) .................................................................. 12

9

10

11

*H-D Michigan, Inc. v. Biker's Dream, Inc.*,
    48 U.S.P.Q.2d 1108 (C.D. Cal. 1998), *aff'd in part, remanded in part*, 230
    F.3d 1366 (9th Cir. 2000) ....................................................................... 10

12

*Harara v. ConocoPhillips Co.*,
    375 F. Supp. 2d 905 (N.D. Cal. 2005) ..................................................... 22

13

14

*HMH Publishing Co., Inc. v. Brincat*,
    504 F.2d 713 (9th Cir. 1974) .................................................................... 14

15

16

*Horphag Research Ltd. v. Garcia*,
    475 F.3d 1029 (9th Cir. 2007) .................................................................. 19

17

*Jacobsen v. Katzer*,
    535 F.3d 1373 (Fed. Cir. 2008) ................................................................ 22

18

19

*Jada Toys, Inc. v. Mattel, Inc.*,
    518 F.3d 628 (9th Cir. 2008) ............................................................. passim

20

*Jarvis v. K2 Inc.*,
    486 F.3d 526 (9th Cir. 2007) ............................................................. 19, 20

21

22

*Levi Strauss & Co. v. Blue Bell, Inc.*,
    632 F.2d 817 (9th Cir. 1980) .................................................................... 12

23

24

*Lockwood v. Wolf Corp.*,
    629 F.2d 603 (9th Cir. 1980) ...................................................................... 9

25

*Mirage Editions, Inc. v. Albuquerque A.R.T. Co.*,
    856 F.2d 1341 (9th Cir. 1988) .................................................................. 19

26

27

*Moseley v. V Secret Catalogue, Inc.*,
    537 U.S. 418 (2003) ................................................................................. 18

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

1
2

**TABLE OF AUTHORITIES**
(continued)

**Page**

3
4
*Nat'l Health Care Disc., Inc.*,
174 F. Supp. 2d 890 (N.D. Iowa 2001) .............................................................. 24

5
*Optimal Pets, Inc. v. Nutri-Vet, LLC*,
2010 U.S. Dist. LEXIS 55774 (C.D. Cal. June 7, 2010) .................................... 10

6
7
*Ortiz-Gonzalez v. Fonovisa*,
277 F.3d 59 (1st Cir. 2002) ................................................................................ 20

8
9
*Playboy Enterprises, Inc. v. Welles*,
279 F.3d 796 (9th Cir. 2002) .............................................................................. 15

10
*Playboy Enters. v. Starware Publishing Corp.*,
900 F. Supp. 433 (S.D. Fla. 1995) ..................................................................... 19

11
12
*Rano v. Sipa Press, Inc.*,
987 F.2d 580 (9th Cir. 1993) .............................................................................. 22

13
14
*Register.com, Inc. v. Verio, Inc.*,
126 F. Supp. 2d 238 (S.D.N.Y. 2000),
*aff'd*, 356 F.3d 393 (2d Cir. 2004) ............................................................... 23, 24

15
16
*Res. Lenders, Inc. v. Source Solutions, Inc.*,
404 F. Supp. 2d 1232 (E.D. Cal. 2005) .............................................................. 15

17
*Roger-Vasselin v. Marriott Int'l, Inc.*,
2006 U.S. Dist. LEXIS 52729 (N.D. Cal. July 19, 2006) .................................. 10

18
19
*Signatures Network, Inc. v. Estefan*,
2004 U.S. Dist. LEXIS 15374 (N.D. Cal. July 30, 2004) .................................. 21

20
*S.O.S., Inc. v. Payday, Inc.*,
886 F.2d 1081 (9th Cir. 1989) ............................................................................ 22

21
22
*Southwest Airlines Co. v. Farechase, Inc.*,
318 F. Supp. 2d 435 (N.D. Tex. 2004) ............................................................... 24

23
24
*Summit Entertainment, LLC v. Topics Entertainment, Inc.*,
Case No. CV10-00939 GHK (C.D. Cal. 2010) ................................................. 17

25
*Ticketmaster L.L.C. v. RMG Techs., Inc.*,
507 F. Supp. 2d 1096 (C.D. Cal. 2007) .............................................................. 23

26
27
*United States Jaycees v. San Francisco Junior Chamber of Commerce*,
354 F. Supp. 61 (N.D. Cal. 1972), *aff'd*, 513 F.2d 1226 (9th Cir. 1975) ........... 10

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

# TABLE OF AUTHORITIES
## (continued)

**Page**

## STATUTES

15 U.S.C. § 1114(1) .................................................................................. 10

15 U.S.C. § 1114(1)(a) ............................................................................. 25

15 U.S.C. § 1115(a) .................................................................................. 10

15 U.S.C. § 1125(a) .................................................................................. 10

15 U.S.C. § 1125(c) .................................................................................. 16

15 U.S.C. § 1125(c)(1) ............................................................................. 16

15 U.S.C. § 1127(1)(A) ............................................................................ 18

15 U.S.C. § 1127(1)(B) ............................................................................ 18

17 U.S.C. § 101 ........................................................................................ 19

17 U.S.C. § 106(1) ................................................................................... 19

17 U.S.C. § 106(2) ................................................................................... 19

17 U.S.C. § 106(3) ................................................................................... 19

17 U.S.C. § 410(c) ................................................................................... 19

Cal. Bus. & Prof. Code § 14247 ............................................................. 16

## OTHER AUTHORITIES

1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 3.03[A] (2010) ........................................................................................................ 20

## RULES

Federal Rules of Civil Procedure 8(d) ...................................................... 9

Federal Rules of Civil Procedure 56(c) .................................................... 9

Federal Rules of Civil Procedure 56(e) .................................................. 10

## I.     __INTRODUCTION__

This is a case in which a group of infringers, Defendants Beckett Media, LLC ("Beckett"), Curtis Circulation Company, LLC ("Curtis") and Ubiquity Distributors, Inc. ("Ubiquity") (collectively, "Defendants"), seek to freeload off the hard work and significant financial investment made by Plaintiff Summit Entertainment, LLC ("Summit") in the immensely popular motion pictures *Twilight* and *The Twilight Saga: New Moon*[1] (collectively, the "*Twilight* Motion Pictures").

Summit learned that Beckett was publishing and selling an unauthorized 80-page fan magazine devoted almost exclusively to the *Twilight* Motion Pictures and their characters and actors.  This fanzine featured more than 50 copyrighted photographs and artwork of Summit and every one of Summit's 92 Twilight authorized trading cards.  It also featured Summit's distinctive TWILIGHT trademark (shown below) on the cover of the fanzine and as story icons throughout.

<p style="text-align:center; font-size:2em;">twilight</p>

Defendants sold and distributed this fanzine with knowledge of Summit's rights, but without Summit's authorization or a license.  To make matters worse, Defendants sold a second 80-page fanzine featuring Summit's copyrighted photographs after expressly being told to stop and even allowed third parties to continue selling both Twilight fanzines long after an injunction in this case was issued.  Defendants' actions were done willfully and in complete disregard for the valuable rights Summit has spent years and millions of dollars creating.

Defendants concede that they copied, displayed, used and allowed third parties to use Summit's copyrighted images and artwork and Twilight trademarks. Incredibly, however, Defendants claim that they were authorized to do so because

---

[1]   Summit was able to stop the continued infringement of the Twilight Marks and copyrighted material from the *Twilight* Motion Pictures by obtaining a Preliminary Injunction issued by the Court on January 15, 2010.

1   Summit granted Beckett's misleading request for access to Summit's publicity
2   website for journalists commenting on or reviewing the *Twilight* Motion Pictures
3   ("Publicity Website" or "Website").  At no time did Summit <u>ever</u> give Defendants
4   the right to take Summit's copyrighted material and trademarks and repackage them
5   for a series of magazines for commercial gain.

6   The undisputed facts are clear.  Beckett exceeded the limited scope of the
7   license granted by the Terms of Use on the Publicity Website.  The Terms of Use
8   allow the use of the content on the Publicity Website only for a journalistic purpose
9   and only for promotional purposes, and the Terms of Use prohibit the alteration of
10  the images on the Website and the use of the content such to imply endorsement or
11  sponsorship by Summit.  Beckett downloaded <u>all available</u> Twilight content each
12  time it accessed the Website and used all that content to create two stand-alone
13  Twilight magazines, with plans to publish a total of six to twelve issues.  Beckett's
14  actions do not comply with the Terms of Use, and Beckett's conduct amounts to
15  trademark and copyright infringement and unfair competition.  Summit respectfully
16  requests that the Court enter summary adjudication on liability in Summit's favor.

17  ## II.   <u>UNDISPUTED FACTS</u>

18  The following is a summary Plaintiff's Statement of Uncontroverted Facts
19  and Conclusions of Law ("SUF") filed in support of this motion.

20  ### A.   **Plaintiff Summit Entertainment**

21  #### 1.   **Summit and the *Twilight* Motion Pictures**

22  Summit has been financing, producing, and distributing films and related
23  entertainment products since 1991.  (SUF  1.)  One of Summit's most famous
24  projects are the *Twilight* Motion Pictures, the extremely popular and successful
25  trilogy of films about a teenage girl, Isabella ("Bella") Swan, who falls in love with
26  a vampire, Edward Cullen.  Edward is a member of a "family" of vampires known
27  as the Cullen family.  Bella's other suitor in the film is Jacob Black, a werewolf.
28  Jacob belongs to a group of werewolves known as the "wolf pack".  (SUF ¶2.)

1   The first *Twilight* film was released in the United States on November 21,
2   2008, was promoted for many months prior to its release, and has been enormously
3   successful, garnering a huge fan following and an almost cult-like obsession.  (SUF
4   ¶ 3.)  The second *Twilight* film, *The Twilight Saga: New Moon ("New Moon")*, was
5   released in the United States on November 20, 2009, and the third *Twilight* film,
6   *The Twilight Saga: Eclipse ("Eclipse")*, was released on June 30, 2010.  Like their
7   predecessor, both *New Moon* and *Eclipse* were heavily promoted in the months
8   leading up to their release, and have been enormously successful.  The cult-like fan
9   following for the *Twilight* Motion Pictures also has continued to grow, creating
10  what some have called the "Twilight Phenomenon."  (SUF ¶ 4.)

### 2.   Summit's Intellectual Property Rights

12  Summit owns numerous intellectual property rights related to the *Twilight*
13  Motion Pictures.  Summit is the owner of the trademark TWILIGHT in block letters
14  and in the distinctive font shown above (the "Twilight Marks").  (SUF ¶ 5.)
15  Summit has used the Twilight Marks for motion pictures, DVDs, posters, and
16  various other items of merchandise and that use has been extensive.  (SUF ¶ 6.)
17  Summit also owns registrations and numerous pending federal trademark
18  applications for the Twilight Marks on various and diverse goods and services,
19  including posters, calendars, decals, photograph albums, poster books and
20  magazines in the field of entertainment.  (SUF ¶ 7.)

21  Summit has licensed its Twilight Marks to more than 100 third parties to sell
22  a wide variety of products, including posters, clothing, trading cards and
23  beverageware and for promotions.  (SUF ¶ 8.)  Summit first sold posters bearing the
24  TWILIGHT mark in May of 2008, and continues to sell such products.  (SUF ¶ 9.)

25  Summit also owns copyrights in the trailers and full-length films for the
26  *Twilight* Motion Pictures, as well as for all publicity, promotional, unit, and special
27  shoot photography and artwork related to the *Twilight* Motion Pictures.
28  (SUF ¶ 10.)  Summit owns valid and enforceable copyright registrations for the

copyrighted works that are at issue.  (SUF ¶ 11.)

As with its trademarks, Summit has licensed its copyrighted photographs to third parties to promote the *Twilight* Motion Pictures, as well as for various items of merchandise related to the *Twilight* Motion Pictures and bearing the TWILIGHT mark.  (SUF ¶ 12.)  Summit licensed its copyrighted photographs and Twilight Marks to a company called Inkworks for trading cards.  Pursuant to that license, Inkworks created and sold 92 different Twilight trading cards, all of which are subject to copyright protection (the "Trading Cards").  (SUF ¶ 13.)  When Inkworks went out of business, Summit's primary merchandise licensee, NECA, acquired the rights to sell TWILIGHT trading cards.  (SUF ¶ 14.)

In the context of *New Moon's* promotion, Summit also licensed certain photographs associated with the *Twilight* Motion Pictures to *People* magazine to publish a Special Collector's Edition related to the release of New Moon. (SUF ¶ 15.)  Summit has also been requested several times to grant licenses for the type of magazines that Defendants published and distributed.  (SUF ¶ 16.)

### 3.    Summit's Publicity Website

The Publicity Website is located at <www.summitpublicity.com> and contains downloadable copyrighted photographs and other artwork from or related to the *Twilight* Motion Pictures, along with other material (the "Content"). (SUF ¶ 17.)  The Publicity Website and Content is for journalists to be able to use images from or related to Summit's films when reviewing or commenting on Summit's motion pictures, including the *Twilight* Motion Pictures.  (SUF ¶ 18.)

The Terms of Use state that Summit is the owner of various copyrights, trademarks and other intellectual property related to the *Twilight* Motion Pictures. (SUF ¶ 19.)  The Terms of Use also state that (a) the Content may be used "only for journalistic purposes" in connection with motion pictures distributed by Summit; (b) contain numerous restrictions concerning the Content and the Website, including prohibiting the editing, altering or modifying of any of the Website's

Content without Summit's prior written approval; and (c) prohibit the use of the Content in any manner that could constitute an express, direct or indirect tie-in or endorsement of the media outlet or its products.  Further, the Terms of Use provide that the "[u]nauthorized use [of] the Content may be a violation of law which may result in civil and criminal liability" and that "Summit has the right to enforce its intellectual property rights to the fullest extent of the law."  (SUF ¶ 20.)

Once approved by Summit and granted access to the Website, Beckett received, as other registrants, an email with Beckett's ID and password expressly stating that the use of the Content was for promotional use only and sale of it was prohibited.  (SUF ¶ 21.)  Nowhere in the Terms of Use or the registration email does it say that third parties can merchandise the Content.  (SUF ¶ 22).

## B.    Beckett, Curtis, and Ubiquity

Beckett is a publisher of sports and entertainment collectibles and memorabilia magazines and distributes them widely in various outlets throughout the United States, including Wal-Mart, Target, Barnes & Noble, and Borders Books.  (SUF ¶ 23.)  Beckett operates a website at <www.beckett.com> and sells its magazines on that site through its Beckett store, as well as in retail stores.  (SUF ¶ 24.)  Beckett has an eBay store and hosts the Beckett Marketplace where its dealers can sell various products purchased from Beckett.  (SUF ¶ 25.)  Beckett's store and the Beckett Marketplace are governed by different sets of terms of use, which apply by virtue of using the websites.  The terms of use for the Beckett Marketplace require an "I Accept" box to be checked (SUF ¶ 26) – just like Summit's Publicity Website.

Curtis is a national distributor of magazines, (SUF ¶ 27), which distributed Beckett's Twilight magazines.  (SUF ¶ 28.)  Curtis sells magazines to newsstands and to independent dealers, who in turn sell to retailers and the general public. (SUF ¶ 29.)  Curtis facilitated the sale of the Twilight Fanzines by promoting them, working with retailers on promotions, and distributing them.  (SUF ¶ 30.)

1  Beckett has a dealer program in which it sells magazines directly to dealers,

2  who in turn sell to retailers and the public.  (SUF ¶ 31.)  Ubiquity used to be a

3  dealer of Beckett, but is now a wholesaler of Curtis.  (SUF ¶ 32.)  Ubiquity

4  "wholesales over 2200 periodicals from around the globe to hundreds of stores

5  spread throughout North America," (SUF ¶ 33), including general interest

6  bookstores, newsstands, and grocery and convenience stores.  (SUF ¶ 34.)  Ubiquity

7  displayed the Twilight Fanzines for sale even after the Preliminary Injunction was

8  entered, which covers Beckett's distributors.  (SUF ¶ 35.)

9  ### C.   Defendants' Infringing Products

10  Beckett published and sold, and Curtis and Ubiquity distributed and sold, two

11  unlicensed 80-page Twilight fanzines.  Beckett had a third one ready to print after

12  receipt of Summit's three cease and desist letters, and only decided not to when

13  Summit filed this lawsuit and sought a TRO.  (SUF ¶ 36.)

14  ### 1.   The First Twilight Magazine

15  Beckett contends that the first fanzine is entitled "Beckett Teen Sensations

16  Presents: Twilight Unofficial Collector's Guide Magazine" (the "First Twilight

17  Fanzine").  (SUF ¶ 37.)  But one can barely see anything other than TWILIGHT in

18  Summit's stylized font on the cover, and all Defendants refer to the magazine

19  simply as Twilight.  (SUF ¶ 38.)  The First Twilight Fanzine infringes Summit's

20  intellectual property rights in numerous significant respects.  (SUF ¶¶ 39-44).

21  Beckett printed 149,975 units of the First Twilight Fanzine, which it sold on

22  newsstands, in retail stores and on its website from June until September 2009.

23  (SUF ¶ 45.)  The on-sale date[2] was July 21, 2009, but Beckett and Curtis promoted

24  the magazine at least a month before.  The off-sale date was October 19, 2009.

25  (SUF ¶ 47.)  This Fanzine was created without Summit's "prior written approval.

26  (SUF ¶ 48.)  Beckett sold the First Twilight Fanzine for $9.99 per unit.  (SUF ¶ 49.)

27  ---

[2]    The "on-sale date" refers to the date that the magazine is offered for sale to the public at retailers.  The "off-sale date" is the date that the retailers are to remove the magazine from the shelves and take it off sale.  (SUF ¶ 46.)

### 2.      The Second Twilight Fanzine

Beckett published and sold a second Twilight Fanzine (the "Second Twilight Fanzine", collectively the "Twilight Fanzines"), and stated in the Editor's Notes "Due to the overwhelming response from our readers, we've decided to continue the Twilight Saga coverage for at least another six issues." (SUF ¶ 50.)  The Second Twilight Fanzine was entitled "Beckett Teen Sensations Presents: Twilight Unofficial Collector's Guide Magazine".[3]  (SUF ¶ 52.)  But the use of TWILIGHT on the Second Twilight Fanzine dominated the landscape and the other words in the title are imperceptible.  (SUF ¶ 53.)  The Second Twilight Fanzine also infringed Summit's rights in numerous respects.  (SUF ¶¶ 54-56.)

Beckett printed 247,385 units of the Second Twilight Fanzine, almost 100,000 more than the First Twilight Fanzine.  (SUF ¶ 57.)  It had an on-sale date of September 15, 2009 and an off-sale date of November 9, 2009.  (SUF ¶ 58.)

Beckett used the Twilight Fanzines to promote its other products.  (SUF ¶ 59.)   Beckett advertised a Jonas Brothers fanzine in the First Twilight Fanzine and a Miley Cyrus fanzine in the Second Twilight Fanzine.  (SUF ¶ 60.)  Beckett also used a Twilight trading card on the cover of its Jonas Brothers fanzine, and used Summit's Twilight photograph appearing on the cover of the First Twilight Fanzine as the cover of its Facebook page.  (SUF ¶ 61.)   Beckett also sold ads for the Twilight Fanzines in other publications, and allowed Twilight fan websites to display the Twilight Fanzines, all without Summit's permission. (SUF ¶ 62.)

### 3.      The Twilight Printing Plates

Beckett also offered for sale on eBay nine sets of printing plates used to print the Twilight Fanzines.  (SUF ¶ 63.)  The printing plates are metal plates – four per magazine – which were used by Beckett's printer to actually print and publish the Twilight Fanzines.  Beckett sold the printing plates for $59.99, $59.99, $60.00,

---

[3]      It is undisputed that all Defendants, especially Beckett, refer to the Twilight Fanzines as "Twilight" or "Twilight Magazines".  (SUF ¶ 51.)

$60.00, $74.99, $29.99, $34.99, $50.00 and $50.00, respectively.  (SUF ¶ 64.)

Beckett concedes that its Twilight printing plates are collectible products, not covered by the Terms of Use.  (SUF ¶ 65.)

### 4.    Beckett's Access to the Summit Publicity Website

In late April 2009, Beckett registered for and was granted access to the Summit Website by identifying itself as a journalist and requesting permission for "newsstand magazine coverage."  (SUF ¶ 66.)  Summit granted Beckett access to its Website based on that representation.   Beckett did not tell Summit that it was doing a series of TWILIGHT magazines using Summit's stylized font and all available Content on its publicity website.  (SUF ¶ 67.)

### D.    History of this Dispute

In Summer 2009, Summit learned that Defendants were selling the First Twilight Fanzine.  On September 1, 2009, Summit sent Beckett a letter demanding that Beckett cease.  (SUF ¶ 68.)  When Beckett failed to respond, Summit sent a follow-up letter on September 17, 2009.  (SUF ¶ 69.)  Additional efforts to contact Beckett were unsuccessful.  (SUF ¶¶ 70-71.)

On October 2, 2009, Summit learned that Beckett was selling the Second Twilight Fanzine and contacted Beckett's counsel.  (SUF ¶¶ 72-73.)  On October 8, 2009, Summit sent Beckett a letter expressly revoking Beckett's right to access, and use any Content from, the Website.  (SUF ¶ 74.)  That same day, Beckett attempted to access Summit's Publicity Website two more times.  (SUF ¶ 75.)

Beckett continued to sell the Twilight Fanzines after September 1, 2009, and took no effort to recall them until this law suit was filed November 6, 2009.  (SUF ¶ 76.)  Beckett also did not attempt to recall them from its dealers.  (SUF ¶ 77.)

From September to November 2009 – *i.e.*, after Beckett had received Summit's letters dated September 1, 2009, September 17, 2009 and October 8, 2009 – Beckett sold the Second Twilight Fanzine, took no efforts to recall the Fanzine, and sold the Twilight printing plates.  (SUF ¶ 78.)

Beckett was ready to publish a third Twilight Fanzine in November 2009, right before the release of Summit's *New Moon* motion picture.  Beckett had a layout for the third Twilight Fanzine, had advertised it, solicited ad sales for it, and pre-sold copies of it.  (SUF ¶ 79.)  The title of Beckett's third Twilight Fanzine was going to be NEW MOON to coincide and trade on the fame of Summit's *New Moon* motion picture.  (SUF ¶ 80.)  Beckett had plans for a fourth Twilight Fanzine to be released in January 2010 and for a total of six to twelve issues.  (SUF ¶ 81.)

After receiving Summit's first demand letter, Beckett not only continued to sell the First Twilight Fanzine, but almost doubled its distribution for the Second Twilight Fanzine.   (SUF ¶ 82.)  Beckett also used the Summit photograph displayed on the First Twilight Fanzine's cover for its Facebook page, and authorized third parties to use Summit's photographs on their websites. (SUF ¶ 83.)

On November 6, 2010, Summit filed its Complaint against Beckett.[4]  On January 15, 2010, this Court issued a Preliminary Injunction.  Despite this, Beckett still did not recall the Twilight Fanzines from its <u>dealers</u> or even bother to inform them.  (SUF ¶ 84.) Indeed, Beckett's dealers continued to sell the Twilight Fanzines well after the Injunction issued.  (SUF ¶ 85.)  Ubiquity also continued to display the Twilight Fanzine as available for purchase after the Injunction issued.  (SUF ¶ 86.)

## III.   LIABILITY IS ESTABLISHED ON SUMMARY ADJUDICATION

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FRCP 56(c).  A failure to deny an allegation in an answer to the complaint constitutes an admission. FRCP 8(d); *See Lockwood v. Wolf Corp.*, 629 F.2d 603, 611 (9th Cir. 1980).

The moving party has the burden of demonstrating the absence of a genuine

---

[4]    On July 28, 2010, Summit filed a Second Amended Complaint in which it added Defendants Curtis and Ubiquity as parties.

issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party meets its burden, the nonmoving party must go beyond the

pleadings and, by its own affidavits or discovery, "set forth specific facts showing

that there is a genuine issue for trial."  FRCP 56(e).

Courts frequently award summary adjudication on the issue of liability.  *See Roger-Vasselin v. Marriott Int'l, Inc.*, 2006 U.S. Dist. LEXIS 52729, *6-*7 (N.D. Cal. July 19, 2006).  Summary adjudication for a plaintiff in a trademark or unfair competition case is certainly available where, as here, the facts of liability are clear.  *See, H-D Michigan, Inc. v. Biker's Dream, Inc.*, 48 U.S.P.Q.2d 1108, 1110 (C.D. Cal. 1998), *aff'd in part, remanded in part*, 230 F.3d 1366 (9th Cir. 2000); *see also, United States Jaycees v. San Francisco Junior Chamber of Commerce*, 354 F. Supp. 61, 68-69 (N.D. Cal. 1972), *aff'd*, 513 F.2d 1226 (9th Cir. 1975).

### A.     Beckett Infringed the Twilight Marks and Unfairly Competed

To prevail on a claim for trademark infringement, Summit must prove that (1) it is the owner of valid, protectable trademarks; (2) Defendants used the marks without consent; and (3) Defendants' use of the Twilight Marks is likely to cause confusion.  15 U.S.C. § 1114(1); *Century 21 Real Estate Corporation v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988).  The tests for establishing false designation of origin under 15 U.S.C. § 1125(a) and unfair competition are the same as for trademark infringement.  *Century 21*, 846 F.2d at 1178.

### 1.     Summit Owns the Twilight Marks

Summit owns federal trademark registrations for the Twilight Marks, which endow those marks with presumptions of validity.  15 U.S.C. § 1115(a).  Summit also owns common law rights in the Twilight Marks by virtue of its extensive use of those marks for various goods and services.  To assert such rights, Summit must show that (1) it is the senior user of the mark and (2) legally sufficient market penetration exists in a certain geographic area.  *Optimal Pets, Inc. v. Nutri-Vet, LLC*, 2010 U.S. Dist. LEXIS 55774, *5 (C.D. Cal. June 7, 2010).  Where, as here,

the trademark user has acquired a national reputation associated with its mark, it may assert trademark rights even in areas where it has no sales. *Glow Indus. v. Lopez*, 252 F. Supp. 2d 962, 983 (C.D. Cal. 2002).

It is undisputed that Summit is the senior user of the Twilight Marks, and that Summit's extensive nationwide advertising campaign for and extensive nationwide sale of products bearing the Twilight Marks establishes common law rights.

### 2.   Defendants Never Had Consent to Use the Twilight Marks

Defendants contend that they had the right to use the Twilight Marks because they were granted access to the Publicity Website.  This argument fails as a matter of law because the Terms of Use did not grant a trademark license.  The Terms of Use allowed Beckett to enter the site and select certain Twilight photographs to download so Beckett could review or comment on the *Twilight* Motion Pictures. The Terms of Use did not allow Beckett to use the Twilight Marks, particularly the stylized mark, for a series of stand alone fan magazines.  Further, any rights Beckett may have had were expressly revoked as of Summit's <u>first</u> cease and desist letter.

### 3.   There is a Likelihood of Confusion Between the Twilight Marks and Defendants' Use of Them

Courts consider the following factors in determining likelihood of confusion: (1) the strength of the mark, (2) the similarity of the marks, (3) the relatedness of the goods and services, (4) evidence of actual confusion, (5) intent of the infringer, (6) the marketing channels used to sell the respective goods and services, (7) the sophistication of the customers, and (8) the likelihood of expansion of the product lines. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).  Summit need not prevail on all factors, and not all factors must be considered by the Court. *Eclipse, Ltd. v. Data General Corporation*, 894 F.2d 1114, 1117-18 (9th Cir. 1991).

#### a.   Summit's Twilight Marks Are Strong

Strong marks will be afforded the widest ambit of protection from infringing use. *AMF*, 599 F.2d at 349.  The stronger the mark, the greater the protection. *See*

*Academy of Motion Picture Arts and Sciences v. Creative House Productions, Inc.*, 944 F.2d 1446, 1455 (9th Cir. 1991). Strength is evaluated by conceptual strength and by commercial strength. *GoTo.com, Inc. v. Walt Disney Co*., 202 F.3d 1199, 1207 (9th Cir. 2000). The Twilight Marks have both.

"Marks can be conceptually classified along a spectrum of increasing inherent distinctiveness. From weakest to strongest, marks are categorized as generic, descriptive, suggestive, and arbitrary or fanciful." *GoTo.com*, 202 F.3d at 1207. Here, the Twilight Marks are arbitrary as applied to motion pictures, DVDs, and various merchandise.

A mark may also acquire strength through its use in the marketplace, otherwise known as commercial strength. This acquired strength can be shown through length and manner of use of the mark, the amount and volume of advertising, the volume of sales, and public recognition. *Century 21*, 846 F.2d at 1179; *Levi Strauss & Co. v. Blue Bell, Inc*., 632 F.2d 817, 821 (9th Cir. 1980). The commercial strength of the Twilight Marks is shown by significant sales, publicity, commercial tie-ins, fan websites, over 100 license agreements, and substantial attendance at the *Twilight* Motion Pictures. (SUF ¶ 87) A court in this District made factual findings as to the fame and strength of the Twilight Marks in another case filed by Summit where a preliminary injunction was also entered. (SUF ¶ 88.)

### b.    The Marks Are Identical

Similarity of the marks is tested by comparing sight, sound, and meaning. *AMF*, 599 F.2d at 351. The greater the similarity between the two marks, the greater the likelihood of confusion. *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002). Defendants used the identical word mark TWILIGHT and used a stylization of TWILIGHT on the cover of, and throughout the Twilight Fanzines, that is virtually identical to Summit's stylized Twilight mark.

**Summit's Stylized Mark**          **Defendant's Infringing Use**

twilight                              twilight

The slight variation of the letters "g" and "w" in Summit's stylized Twilight mark is inconsequential, especially since Summit's rights in, and registrations for, the trademark TWILIGHT in block letters cover all various fonts.

### c.    The Goods Are Related

"When the goods produced by the alleged infringer compete for sales with those of the trademark owner, infringement will usually be found if the marks are sufficiently similar that confusion can be expected." *AMF*, 599 F.2d at 348.  The more related the goods are, the more likely consumers will be confused by similar marks. *Entrepreneur*, 279 F.3d at 1147.  Here, the Twilight Fanzines directly compete with the *People* magazine Special Collector's Edition permitted by Summit.  Summit has received several proposals from prospective licensees who wish to offer the same type of magazine offered by Defendants.  (SUF ¶ 89.) Summit sells movie companion books that are directly competitive with the Twilight Fanzines.  (SUF ¶ 90.)  The Twilight Fanzines also compete with the posters and trading cards that Summit's licensees sell, as shown by Beckett's use of the key artwork for *New Moon*, known as a "one sheet" on the pull out poster included in the First Twilight Fanzine.  (SUF ¶ 91.)  This was the same artwork used by Summit for one of its most successful selling posters.

### d.    There Has Been Actual Confusion

Though unnecessary, there is evidence of actual confusion. *Eclipse*, 894 F.2d at 1118.  One of Defendants' dealers asked whether Beckett had a license for the Twilight Fanzines because he knew publishers were seeking it.  Beckett did not respond.  After the dealer brought it up two more times, Beckett finally conceded that it did not have a license.  (SUF ¶ 92.)  There are other instances of confusion.  The author of the Twilight books upon which the movies are based believed the

Twilight Fanzines were licensed by Summit, as did the three lead actors in the movies and other publishers.  (SUF ¶ 93.)  Evidence of  actual confusion "is persuasive proof that future confusion is likely."  *AMF*, 599 F.2d at 352.

### e.  Defendants' Intended to Trade on Summit's Goodwill

Intent is not required to be proven because it is not an element of the claim. *Entrepreneur*, 279 F.3d at 1148.  However, where an infringer adopts a mark with knowledge of plaintiff's mark, courts presume that the public will be deceived. *AMF*, 599 F.2d at 352; *HMH Publishing Co., Inc. v. Brincat*, 504 F.2d 713, 720 (9th Cir. 1974).  Here, the undisputed facts show Defendants' intent to trade on the goodwill of the Twilight Marks, by their actions:

- Approached Summit's licensee, Inkworks (and later NECA), for contact information for the licensor of the *Twilight* Motion Pictures, and then never contacted Summit for a license.  (SUF ¶ 94.)

- Used Summit's stylized font for TWILIGHT in 1½" to 2" size on the cover of the Twilight Fanzines.  (SUF ¶ 97.)

- Ignored Summit's September 1, 2009 and September 17, 2009 cease and desist letters and kept selling the Twilight Fanzines.  (SUF ¶¶ 98-99.)

- Ignored Summit's October 8, 2009 letter, which expressly revoked Defendants' alleged license, and kept selling the Twilight Fanzines.  (SUF ¶ 100.)

- Used nearly identical stylized font throughout the Twilight Fanzines for Twilight and other words, all in prominent size and colors.  (SUF ¶ 105.)

- Failed to have any pre-publication review to determine if the content and the name of the Twilight Fanzines infringed Summit's rights or to review the Terms of Use to determine if Beckett's conduct complied with them.  (SUF ¶ 115.)

These facts are but a few examples of Defendants' egregious conduct.  (SUF ¶¶ 95-96, 101-104, 106-114.)  They also show a pattern of complete disregard for Summit's rights, and a clear intent to trade on the goodwill of the Twilight Marks.

### f.  The Distribution Channels Are the Same

"Convergent marketing channels increase the likelihood of confusion." *AMF*, 599 F.2d at 353.  Here, Defendants distributed and sold the Twilight Fanzines widely in various outlets nationwide including newsstands, bookstores, grocery stores, drugstores, and similar retail outlets.  Both the *People* magazine

*Twilight* Edition and Summit's *Twilight* and *New Moon* movie companion books were sold at the same types of locations as the Twilight Fanzines at the same time. Summit's licensed products also have been displayed with Defendants' unlicensed Twilight Fanzines, further suggesting an association.  (SUF ¶ 116.)

### g.     The Customers Are Not Sophisticated

When dealing with inexpensive products, customers are likely to exercise less care, thus making confusion more likely.  *Res. Lenders, Inc. v. Source Solutions, Inc.*, 404 F. Supp. 2d 1232, 1245 (E.D. Cal. 2005).  Fan magazines like the Twilight Fanzines are quintessential "impulse" purchases.  Most newsstands are located in high-traffic areas, and displays at newsstands, bookstores and other stores are often so crowded that only those magazines that immediately attract a consumer's attention are likely to be selected.  Once a consumer, e.g., a teenage girl, sees Summit's Twilight Marks on the cover of the Twilight Fanzines and/or notes that the subject matter is related to the *Twilight* Motion Pictures, she is likely to assume that that fanzine is authorized by Summit and buy it.

In short, there are no facts in dispute as to liability for Summit's trademark infringement and false designation of origin, association and endorsement claims, and liability should be entered in Summit's favor.[5]

### B.     Defendants Are Likely to Dilute the Twilight Marks

"Dilution works its harm not by causing confusion in consumers' minds regarding the source of a good or service, but by creating an association in consumers' minds between a mark and a different good or service.  *Playboy Enterprises, Inc. v. Welles*, 279 F.3d 796, 805 (9th Cir. 2002).  To state a claim for trademark dilution, Summit must show that (1) its Twilight Marks are famous and

---

[5]   Because the undisputed evidence establishes there is a likelihood of confusion, summary adjudication on Summit's claim for unfair competition should be granted as well.  All of Summit's trademark claims, namely, common law and statutory claims of unfair competition are subject to the same test.  *See Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008).

distinctive, (2) Defendants used the Twilight Marks in commerce, (3) Defendants started using Summit's Twilight Marks after the marks became famous, and (4) Defendants' actions are likely to dilute the distinctive quality of Summit's Twilight Marks.  15 U.S.C. § 1125(c)(1); Cal. Bus. & Prof. Code § 14247; *Jada Toys,* 518 F.3d at 634.  The analysis for Summit's dilution claims under federal and California state law is the same.  *Id.*

### 1. The Twilight Marks Are Famous and Distinctive

It is undisputed that the Twilight Marks are famous and distinctive by virtue of their widespread use and recognition.  If the Court needs further convincing, it only need look at the four factors of fame under the Lanham Act:

(A) the duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the trademark owner or third parties;

(B) the amount, volume, and geographic extent of sales of goods or services offered under the mark;

(C) the extent of actual recognition of the mark; and

(D) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c).

The Court need not apply every factor.  *See Jada Toys,* 518 F.3d at 635.

### a. Duration, Extent, and Geographic Reach of Advertising and Publicity of the Twilight Marks

Summit's Twilight Marks have been heavily promoted in connection with the *Twilight* Motion Pictures since at least as early as 2008.  (SUF ¶ 117.)  The following undisputed facts further establish the fame of the Twilight Marks:

- Over 100 unsolicited merchandise and promotion licenses. (SUF ¶ 118.)
- Multiple awards for the *Twilight* Motion Pictures.  (SUF ¶ 119.)
- 9 million units sold of the *Twilight* DVD, making it the top selling DVD in 2009, and 7.2 million units sold of the *New Moon* DVD.  (SUF ¶¶ 122-23.)
- $392 million box office – *Twilight*.  (SUF ¶ 128.)

- $709 million box office worldwide – *New Moon*.  (SUF ¶ 129.)

- $75 million spent advertising the *Twilight* Motion Pictures.  (SUF ¶ 130.)

- $500 million in gross merchandise sales worldwide.  (SUF ¶ 131.)

- 165,000 units of *Twilight* soundtrack sold in the first week. (SUF ¶ 133.)

- 153,000 units of the *New Moon* soundtrack sold in the first week of release, was nominated for two Grammys and made the Grammy compilation compact disc.  (SUF ¶ 134.)

- Discussion by Sen. Amy Klobuchar (D-MN) of the love triangle in the *Twilight* Motion Pictures at the Elena Kagle confirmation hearings.  (SUF ¶ 136.)

- Advertising methods include website, trailers (TV, radio, website), bus shelters, outdoor (billboard), and previews  (SUF ¶ 140.)

- Findings of fact regarding the fame of the *Twilight* Motion Pictures and trademark TWILIGHT in the case of *Summit Entertainment, LLC v. Topics Entertainment, Inc.*, Case No. CV10-00939 GHK (C.D. Cal. 2010).  (SUF ¶ 141.)

- Numerous licensed Twilight Conventions through Summit's licensee, Creation Entertainment.  (SUF ¶ 142.)

This is but a sample of the fame of the Twilight Marks.  (SUF ¶¶ 120-121, 124-127, 132, 135, 137-139.)  These facts overwhelmingly support Summit's contention that the Twilight Marks are famous.  *See Jada Toys,* 518 F.3d at 635.

### b.   Amount, Volume, and Geographic Extent of Sales of Goods and Services Offered Under the Marks

Summit has spent about $75 million in promotions and advertisements featuring the Twilight Marks.  (SUF ¶ 143.)  The *Twilight* Motion Pictures also have generated more than $1 billion in gross revenues.  (SUF ¶ 144.)  Because of the immense popularity of the *Twilight* Motion Pictures, Summit receives significant unsolicited and widespread publicity in the media in the form of third party and collectors' websites, discussion groups and chat rooms, as well as articles and television features. (SUF ¶ 145.)  Indeed, the *Twilight* Motion Pictures have become such a cultural icon, they have obtained an almost cult-like obsession among teen youth.  (SUF ¶ 146.)  Defendants acknowledge and tout these facts in

their promotional materials to sell ads for the Twilight Fanzines and the magazines themselves.  This intense level of publicity and advertising further supports Summit's contention that its marks are famous.  *Jada Toys*, 518 F.3d  at 635.

> ### c.     Extent of Actual Recognition of the Twilight Marks

The facts above demonstrate actual recognition.

> ### d.     The Marks Are Registered on the Principal Register

Summit owns five federal registrations for TWILIGHT and one federal registration for TWILIGHT (Stylized), all on the Principal Register.  (SUF ¶ 153.)

> ## 2.     Defendants Made a Commercial Use Of the Twilight Marks

A mark is deemed used in commerce on goods when it is placed on the goods, or on labels affixed to the goods, and the goods are sold or transported in commerce.  15 U.S.C. § 1127(1)(A) and (B).  Here, Defendants have made commercial use of the Twilight Marks by using them as the name of a series of Twilight Fanzines and used the Marks throughout them.  The Twilight Fanzines were then distributed and sold throughout the U.S. and in foreign countries.

> ## 3.     The Twilight Marks Were Famous in 2009

Defendants first published and sold the Twilight Fanzines in July 2009, which was almost a year after Summit released *Twilight* and after the heavy promotion of that film and its sequel *New Moon*, and well after the Twilight Marks had achieved worldwide success and fame.  Defendants used the Twilight Marks after they had become famous.  *See Jada Toys*, 518 F.3d at 635.

> ## 4.     Defendants' Use is Likely to Dilute The Distinctive Quality of the Twilight Marks

When identical marks are used on similar goods, dilution obviously occurs.  *American Honda Motor Co. v. Protoform*, 325 F. Supp. 2d 1081, 1085 (C.D. Cal. 2004) (citation omitted).  Here, Defendants have used marks identical to Summit's TWILIGHT word mark and virtually identical to Summit's TWILIGHT (Stylized) mark.  As such, a likelihood of dilution can be inferred.  *Moseley v. V Secret*

1  *Catalogue, Inc.,* 537 U.S. 418, 434 (2003); *Horphag Research Ltd. v. Garcia*, 475

2  F.3d 1029, 1036 (9th Cir. 2007); *Jada Toys*, 518 F.3d at  636 n 5.

### C.     Defendants Have Infringed Summit's Copyrights

4          The Copyright Act grants the owner of a copyright certain exclusive rights

5  with respect to the copyrighted work, including the exclusive right to reproduce the

6  work, to prepare derivative works based on the work, and to distribute works to the

7  public.  17 U.S.C. § 106(1), (2), (3).  To establish direct infringement, Summit must

8  show that (1) it owns copyrights to the infringed works, and (2) Defendant

9  infringed those copyrights by invasion of one of Summit's exclusive rights.  *Dr.*

10  *Seuss Enterprises, L.P. v. Penguin, USA, Inc.*, 109 F.3d 1394, 1398 (9th Cir. 1997).

### 1.     Summit Owns the Copyrighted Works

12          It is indisputable that Summit holds copyright registrations for most, if not

13  all, of the works appearing in the Twilight Fanzines (collectively, the "Copyrighted

14  Works").  (SUF ¶ 148.)  These registrations constitute *prima facie* evidence of

15  Summit's copyrights in the works. 17 U.S.C. § 410(c); *see also Ets-Hokin v. Skyy*

16  *Spirits, Inc.*, 225 F.3d 1068, 1075-76 (9th Cir. 2000).

### 2.     Defendants Infringed the Exclusive Right to Reproduce

18          Defendants have infringed Summit's exclusive right to reproduction by

19  making unauthorized copies of the Copyrighted Works in the Twilight Fanzines.

20  Each unauthorized copy violates Summit's exclusive right under 17 U.S.C.

21  § 106(1).  *See Playboy Enters. v. Starware Publishing Corp.*, 900 F. Supp. 433, 438

22  (S.D. Fla. 1995); *Elbe v. Adkins,* 812 F. Supp. 107, 109 (S.D. Ohio 1991)

23  (defendant infringed right to reproduction by copying photographs).

### 3.     Defendants Infringed the Exclusive Right to Create Derivative Works

26          Defendants also infringed Summit's exclusive right to create derivative

27  works by modifying many of the Copyrighted Works.  17 U.S.C. § 101; *Jarvis v.*

28  *K2 Inc.*, 486 F.3d 526, 531 (9th Cir. 2007); *Mirage Editions, Inc. v. Albuquerque*

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

1    *A.R.T. Co.*, 856 F.2d 1341, 1343-44 (9th Cir. 1988).  Modifications need not be

2    grand or sweeping to cause a work to be derivative – even modest changes to an

3    original work of authorship can infringe the derivative work right.  *See* 1 Melville

4    B. Nimmer & David Nimmer, *Nimmer on Copyright* § 3.03[A] (2010) ("Any

5    variation will not suffice, but one that is sufficient to render the derivative work

6    distinguishable from its prior work in any meaningful manner will be sufficient.").

7    Here, Beckett modified Summit's copyrighted photographs without

8    Summit's authorization (and in breach of the Terms of Use), by (a) cropping the

9    photographs to make them smaller and/or to remove some of the photos' subjects;

10   (b) removing the backgrounds of the photographs; (c) superimposing the subjects of

11   photographs on to different backgrounds; (d) superimposing words, phrases and

12   other designs on to photographs; (e) separating multiple subjects in a single photo

13   into multiple photographs, each with a single subject; and (f) using the photographs

14   to make unauthorized collages.  (SUF ¶ 149.)  *See Jarvis*, 486 F.3d at 531.  Beckett

15   has conceded that it did not have any right to make these changes.  (SUF ¶ 150.)

16   Curtis modified the Copyrighted Work by adding text and cropping it to be

17   included in Curtis' Special Issue Alert email blast.  (SUF ¶ 151.)

### 4.    Defendants Infringed the Exclusive Right to Distribute

19   Defendants infringed Summit's exclusive right to distribution by offering and

20   selling to the public the Twilight Fanzines without Summit's authorization.    *See*

21   *Ortiz-Gonzalez v. Fonovisa*, 277 F.3d 59, 62 (1st Cir. 2002); *Cable/Home*

22   *Communication Corp. v. Network Productions, Inc.*, 902 F.2d 829, 843 (11th Cir.

23   1990).  To the extent Curtis and Ubiquity claim they did not know the products

24   were infringing, this is immaterial.  "[I]ntent is not an element of infringement, and

25   the copyright holder may proceed against any member of the chain of distribution."

26   *Costello Pub. Co. v. Rotelle*, 670 F.2d 1035, 1044 (D.D.C. 1981); *Educational*

27   *Testing Serv. v. Simon*, 95 F. Supp. 2d 1081, 1087 (C.D. Cal. 1999).

28

### 5.     Beckett Exceeded the Scope of Rights in the Terms of Use

Beckett's defense to Summit's copyright claim is that the Twilight Fanzines were authorized by Summit because Beckett had access to Summit's Website. This contention is unconvincing for several reasons.

First, the Terms of Use of the Website state that the Content may be used "only for journalistic purposes" in connection with Summit's motion pictures. (SUF ¶ 152.) The Terms of Use also prohibit Beckett from editing, altering or modifying any of the Website's Content without Summit's prior written approval. (SUF ¶ 153.) These terms are unambiguous as a matter of law. *A. Kemp Fisheries, Inc. v. Castle & Cooke, Inc., Bumble Bee Seafoods Div.*, 852 F.2d 493, 496 n.2 (9th Cir. 1988) (contract interpretation can be decided as a matter of law on summary judgment); *Signatures Network, Inc. v. Estefan*, 2004 U.S. Dist. LEXIS 15374, *14 (N.D. Cal. July 30, 2004) (granting summary judgment when terms of agreement were unambiguous). The email that is sent to a successful registrant clearly states:

> TM and (c) 1009 Summit Entertainment, LLC. All rights reserved. Property of Summit Entertainment. For promotional use only. ***Sale, duplication, other transfer of this material or excerpts thereof, is strictly prohibited***. (SUF ¶ 154.) (emphasis added.)

Beckett's use of Summit's Copyrighted Works in the Twilight Fanzines far exceeds any of the rights it may have received under the Terms of Use. Beckett used a vast amount of Summit's copyrighted works and the Twilight Marks to create a stand-alone product, the Twilight Fanzines, for commercial, not journalistic or promotional, purposes. Beckett's use of Summit's Copyrighted Works in these stand-alone products was so extensive that it created, as noted above, the false impression that Summit endorsed, licensed or sponsored the Twilight Fanzines and/or Beckett, which Summit did not. Beckett also modified Summit's Copyrighted Works without Summit's prior written approval, and repackaged Summit's Copyrighted Works into a piece of merchandise that it sold for $9.99 an issue. Becket knew that it did not have this right under the Terms of Use. (SUF

1  ¶ 155.)  Each of these acts goes far beyond the scope of the Terms of Use.  *See*

2  *Jacobsen v. Katzer*, 535 F.3d 1373, 1379-82 (Fed. Cir. 2008); *S.O.S., Inc. v.*

3  *Payday, Inc.*, 886 F.2d 1081, 1087-88 (9th Cir. 1989).

4      Second, even assuming *arguendo* that Beckett had the rights to use Summit's

5  Copyrighted Works in the Twilight Fanzines (which it did not) those rights were

6  revoked by Summit on September 1, 2009 with the first cease and desist letter, and

7  again on September 17, 2009 with the second letter, and again on October 8, 2009

8  with Summit's third letter.  After this revocation, Defendants continued to sell the

9  Twilight Fanzines, and Beckett offered for sale and sold on eBay printing plates

10  used to make the Twilight Fanzines, which Beckett admits are not covered by the

11  Terms of Use.  This further constitutes copyright infringement on the part of

12  Beckett.  *See Rano v. Sipa Press, Inc.*, 987 F.2d 580, 586 (9th Cir. 1993) (once a

13  non-breaching party to a copyright license exercises a right of rescission by virtue

14  of a material breach of the agreement, any further distribution of the copyrighted

15  material constitutes infringement).

16      Third, further undermining Defendants' "license defense" is that they used

17  photographs and artwork related to the *Twilight* Motion Pictures that are not part of

18  the Content on the Website.  (SUF ¶ 156.)  At least four of the photographs in the

19  first Twilight Fanzine, at least four of the photographs in the second Twilight

20  Fanzine, and all of the Trading Card images appearing throughout the two Twilight

21  Fanzines are *not* included in the Content on the Website.  (SUF ¶ 157.)  Because

22  these photographs were never available on the Publicity Website, Defendants, by

23  definition, could never have obtained *any* license to use them.

24      **D.    Beckett Breached Its Contract With Summit**

25      To succeed on its breach of contract claim, Summit must show (1) the

26  existence of a valid contract (2) Summit's performance or excuse for

27  nonperformance, (3) Beckett's breach, and (4) resulting damages.  *Harara v.*

28  *ConocoPhillips Co.*, 375 F. Supp. 2d 905, 906 (N.D. Cal. 2005) (citations omitted.)

1  Here, Summit and Beckett entered into a contract, the terms of which are set

2  out in the Terms of Use (the "Contract").  Beckett admits having requested

3  permission to access the Website.  (SUF ¶ 158.)  At the time of the request, Beckett

4  had to affirmatively agree to the Contract before its request would be submitted;

5  there is no way to proceed without clicking the "I Accept" button accepting the

6  Terms of Use.[6]  (SUF ¶ 160.)  Once granted access, Beckett viewed and navigated

7  its way through the website and copied all Twilight photographs available on the

8  Website.  (SUF ¶ 161.)  Such actions manifest an assent to be bound.  *Ticketmaster*

9  *L.L.C. v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1107 (C.D. Cal. 2007); *see also*

10 *Register.com, Inc. v. Verio, Inc.*, 126 F. Supp. 2d 238, 248 (S.D.N.Y. 2000), *aff'd*,

11 356 F.3d 393 (2d Cir. 2004).

12 Beckett had adequate notice of the Terms of Use based on the following

13 undisputed facts:  (a) there are hyperlinks to the Terms of Use on every page of the

14 Website; (b) the Terms of Use appear on the registration page 2 "below the login

15 information and 1" under "Click to Register"; (c) the Terms of Use appear

16 immediately under the largest field on the screen -- the Reason for Access field,

17 which must be completed before registration can be accomplished; (d) the Terms of

18 Use require a click of the "I Accept" box and a user cannot proceed to the Content

19 without clicking "I Accept"; (e) the Terms of Use are of equal size of other text on

20 the registration page and throughout the Website; (f) the Terms of Use are in dark

21 text with white letters to draw the user's attention; (g) the Terms of Use are on the

22 Account Update page, which Beckett used; (h) the Terms of Use are "above the

23 fold" (e.g. the line demarking text on a website before one scrolls down) on the

24 Website; and (i) the Terms of Use are short -- only two pages long.  (SUF ¶ 162.)

25 There also is no question that Summit performed its obligations by providing

26

---

27 [6]  Beckett is very familiar with the process of clicking "I accept the terms of

28 use", as it had done so repeatedly in the past with other websites, including in connection with its own Beckett Marketplace website.  (SUF ¶ 159.)

Defendant with a license for limited use of Summit's Content.  Beckett breached the Contract by, among other things, (a) using the Content on the Website for purposes other than a journalistic use; (b) editing, altering and/or otherwise modifying the Content without Summit's prior written approval; (c) using the Content in such a manner that falsely implies Summit's endorsement or sponsorship of the Twilight Fanzines and/or Beckett; and (d) repackaging Summit's Copyrighted Works and Twilight Marks and selling it in a series of stand alone Twilight Fanzines.  Under a breach of contract claim, most courts that have considered the issue have held that a conscious violation of a website's terms of service/use will render the access <u>unauthorized</u> and/or cause it to exceed authorization.  *See, e.g., Register.com*, 126 F. Supp. 2d at 247-51; *cf. Nat'l Health Care Disc., Inc.*, 174 F. Supp. 2d 890, 899 (N.D. Iowa 2001); *Southwest Airlines Co. v. Farechase, Inc.*, 318 F. Supp. 2d 435, 439-40 (N.D. Tex. 2004); *Am. Online, Inc. v. LCGM, Inc.*, 46 F. Supp. 2d 444, 450 (E.D. Va. 1998).

Summit has been damaged and continues to be damaged by Beckett's breach in the form of and continuing harm to the value of its trademarks, copyrights, and goodwill and lost licensing revenue.

## IV.   CURTIS AND UBIQUITY ARE LIABLE DIRECTLY AND AS JOINT TORTFEASORS

It does not matter whether Curtis was involved in the creation of the Twilight Fanzines and/or the affixation of the Twilight Marks.  *See, e.g., Digital Theater Sys. v. Mintek Digital, Inc.*, 2004 U.S. Dist. LEXIS 16832, *10 (C.D. Cal. May 25, 2004); *see also El Greco Leather Products Co. v. Shoe World, Inc.*, 806 F.2d 392, 396 (2d Cir. 1986).  Curtis is a joint tortfeasor with Beckett and is therefore directly liable for Beckett's acts of infringement as well as for its own acts of infringement. *Costello*, 670 F.2d at 1043 ("Courts have long held in patent, trademark, literary property, and copyright infringement cases, any member of the distribution chain can be sued as an alleged joint tortfeasor.") (citation omitted).

1    Even if Curtis were not a joint tortfeasor, it is undisputed that Curtis was

2    actively involved in the marketing and sale of the Twilight Fanzines, which is

3    standard in Curtis' business.  The undisputed facts are:

4    • Curtis provides marketing support to its publishers to help the publishers better market and sell their magazines, and this was done for Beckett.

5    (SUF ¶ 163.)

6    • Curtis wrote a Special Issue Alert for the third Twilight Fanzine touting "Take advantage of the additional profits this special issue will deliver!"

7    and sent it to its customers.  (SUF ¶ 164.)

8    • Curtis retained control over the wholesalers, retailers and other agents

9    who carried the Twilight Fanzines and had the right to cut off a specific wholesaler. Indeed, Curtis had exclusive control over the manner and means of distribution as it

10   relates to wholesalers who received the Twilight Fanzines.  (SUF ¶ 170.)

11   These are but a few of the ways Curtis played an active role in the

12   distribution of the infringing Twilight Fanzines.  (SUF ¶¶ 165-169.)

13   As for Ubiquity, it marketed and sold the Twilight Fanzines and continued to

14   display them for sale three months after the Preliminary Injunction was entered.

15   (SUF ¶ 170).  Even if Ubiquity contends that it was not aware of the Preliminary

16   Injunction, that does not negate Ubiquity's direct infringement by marketing and

17   selling the Twilight Fanzines.  Just as with Summit's copyright claim, it is well-

18   settled that a distributor like Curtis and a reseller like Ubiquity can engage in

19   trademark infringement merely by distributing the infringing product.  15 U.S.C.

20   § 1114(1)(a); *Costello Publishing*, 670 F.2d at 1043.

21   **V.    CONCLUSION**

22   For these reasons, Summit respectfully requests that its motion for summary

23   adjudication on liability be granted in its entirety.

24                                            MANATT, PHELPS & PHILLIPS, LLP

25   Dated:  January 10, 2011

26                                            By:/s/ Jill M. Pietrini
                                                 Jill M. Pietrini
27                                               *Attorneys for Plaintiff*
                                                 SUMMIT ENTERTAINMENT, LLC

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

300188224.4                                    25